## BYRNE v. UNITED STATES.
### No. 450.

Circuit Court of Appeals, Second Circuit. June 10, 1935.

Martin Conboy, U. S. Atty., of New York City (Walter H. Schulman, Asst. U. S. Atty., of New York City, of counsel), for defendant-appellant.

John M. MacGregor, of New York City (Warren E. Miller, of Washington, D. C., of counsel), for plaintiff-appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiff Byrne recovered a judgment against the United States for $6,690.75 upon a policy of war risk insurance. The complaint alleged that while the policy was in force he became totally and permanently disabled, and the question before us is whether the proof of total and permanent disability offered was sufficient to make

a case for submission to the jury that rendered the verdict on which the judgment was entered.

Byrne was trained as a machinist and had followed that calling for ten years before the World War. He had taken a course at a business college to learn mechanical drawing and had served an apprenticeship in which he came in contact with all kinds of machinery. He had worked for the Westinghouse Electric, Westinghouse Air Brake, for Swain & Angel and Phillips & McLaren, and in connection with his work had run a lathe, run planers and drill presses, assembled parts of machinery, and made gauges of various kinds. Shortly after the United States entered the war, he enlisted in the army and was assigned to the Fifth United States Engineers. He sailed for France with the Expeditionary Forces on July 9, 1917, and in the autumn and early winter of 1917–1918 his company was engaged in constructing railroads near Bordeaux. His personal occupation consisted in handling rails. This he did without using gloves or tongs. The rails were 30 feet long, weighed 90 pounds to the yard, and it took eight men to handle one rail and take it off a flat car and carry it to where it was laid on the ties. The weather was cold and there was much snow and ice. As a result of lifting the rails with unprotected hands Byrne became subject to what is known as "Dupuytren's Contraction." This resulted in a shrinkage of the hands and a limitation of the flexion of the fingers and pain that made it impossible to do the heavy work of a machinist which he had done before the war. It is not disputed that this condition lessened his field of employment and was permanent.

Byrne testified that there was a constant contracting pain in his hands, that his fingers were awkward and, if he used a pen or any tool, in a short time his arms would begin to jump, and that after writing for five or ten minutes, it would be an hour or two before he could hold a newspaper steadily enough to read the print. His wife, a trained nurse whom he married in 1925, also testified that when he used a pen or pencil for ten or fifteen minutes he seemed to be unable to hold the crayon or pencil, his fingers began to twitch, and sometimes the twitching got up in his arms and he had to rest until it subsided.

Nevertheless in letters written in 1920 and 1927, one of them dated November 22, 1920, and a rather long one, he wrote in a firm, clear hand. Moreover the two comic figures he drew after the war that appear in the letter of December 19, 1927 (Exhibit L), are quite as good work as the figure (Exhibit M) which he drew before he suffered any injuries. Each would indicate a hand adept and capable of using crayon or pencil for drawing.

He testified that he worked for the Maxwell Motor Company in Detroit from July to September, 1919, but said that because of the condition of his hands he could not work properly as a machinist and was therefore shifted into the drafting room (as he had had some previous experience in drafting) and that toward the end of his employment he acted as a shipping clerk. Thereafter he worked a short time in Pittsburgh for the United States government at a store where they were retailing surplus army supplies and received $6.20 per day. He testified that he next did relief work at the Hanlon cigar stand at times when the regular clerks were absent, receiving only about $8 per week.

In spite of this testimony, when applying for disability compensation in 1920, he swore that he was employed by Joseph H. Hanlon in April, 1920, as an agent at $125 per month and had been employed from July, 1919, to December, 1919 at from $6 to $6.20 per day. Likewise in numerous applications for reinstatement of his converted war risk insurance he answered "No" to the question: "Are you now permanently and totally disabled?" Moreover in a letter to the Department under date of November 22, 1920, he said: "My present job is clerking in a cigar stand, seven days a week, ten hours a day, for $18 per week." Thus he successively represented that he worked for Hanlon at $125 per month, $18 per week, and only $8 per week.

After leaving Hanlon he applied for vocational training. His application was approved by the government and he was allowed $100 per month while doing placement work as a commercial artist for the Pittsburgh Publishing Company, from July 11, 1921, to March 1, 1923. He worked two years in placement training for different concerns and took institutional training as a commercial artist with the International Correspondence School. After July 24, 1924, the date of his determined rehabilitation, he worked for publishing companies until about the middle of November, 1924, and later sold stock for a former army friend and attempted to make and sell sketches for advertising. It would seem that his limited success as a commercial

artist was due to something besides the contraction of his fingers, for he appears to have worked as such for some years.

While the evidence indicated that Byrne could not act as a machinist, we find nothing to show that he was totally disabled from following continuously a substantially gainful occupation of some kind. There was nothing the matter with him except that he was unable to contract his fingers for more than a short time without pain. He certainly could tend a cigar store, as he did for Hanlon, or sell stock, mortgages, or real estate, or act as a clerk in a store where he had little figuring to do, and the goods to be handled were light, or could serve as a watchman, messenger, or timekeeper. His claim that he was totally and permanently disabled is overwhelmingly contradicted not only by the work he engaged in for some years, but by his own repeated assertions to the contrary in written applications for reinstatement of his policy. His application for vocational training was in itself evidence that he did not believe that he was totally and permanently disabled, and the allowance of vocational training by the government indicated that its officials shared his belief. Mason v. United States (C. C. A.) 63 F.(2d) 791. Indeed, he never made a claim of total and permanent disability until he had been out of the army for nine years and did not bring suit until 1931. There is not the slightest proof, medical or otherwise, that he would be harmed by work requiring little use of his hands.

Because of lack of substantial evidence that the plaintiff was totally and permanently disabled, the trial court should have directed a verdict for the United States.

Judgment reversed.